**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **FAIRFIELD ROYALTY CORP.** | **CIVIL ACTION** |
| **VERSUS** | **NO. 10-3446** |
| **ISLAND OPERATING COMPANY, INC.** | **SECTION "B"(5)** |

## ORDER AND REASONS

Before the Court is Defendant Island Operating Company Inc.'s ("Defendant") Motion for Summary Judgment relating to the issue of borrowed servants. (Rec. Doc. No. 56). Plaintiff Fairfield Royalty Corporation ("Plaintiff") submitted its Opposition (Rec. Doc. No. 75), which was met with Defendant's Reply Memorandum. (Rec. Doc. No. 88). Also before the Court is Defendant's Motion for Partial Summary Judgment. (Rec. Doc. No. 52). Plaintiff submitted its Opposition (Rec. Doc. No. 58), which was met with Defendant's Reply Memorandum. (Rec. Doc. No. 68).

Accordingly and for the reasons articulated below,

**IT IS ORDERED** that Defendant's Motion for Summary Judgment relating to the issue of borrowed servants is **DENIED**.

**IT IS FURTHER ORDERED** that Defendant's Motion for Partial Summary Judgment is **DENIED**.

## PROCEDURAL HISTORY

Apache Corporation ("Apache"), Hilcorp Energy Company ("Hilcorp"), and Plaintiff are co-owners of the East Cameron 2 ("EC-2") oil and gas platform and co-lessees of certain associated mineral rights. (Rec. Doc. No. 35-2, pp.2-3). Consequently, Apache,

Hilcorp and Plaintiff entered into an Offshore Operating Agreement ("OOA"), specifying that Apache serve as operator of the EC-2 platform, with Hilcorp and Plaintiff serving as non-operators. (*Id.*). Apache, in its role as operator of the platform, entered into a Master Service Contract ("Contract") with Defendant to provide contract operators to assist on the EC-2 platform. (*Id.*).

On January 13, 2010, a fire broke out on the platform. (Rec. Doc. No. 34-3, p.6). Shortly thereafter, Plaintiff filed a complaint alleging Defendant was liable for damages in excess of $800,000 that resulted from the fire. (Rec. Doc. No. 1). Plaintiff seeks three separate items of damages, *i.e.*, property damage, pollution/oil spill response, and loss of revenue/production. (Rec. Doc. no. 52-2, p.2). Defendant filed its answer on September 23, 2011 (Rec. Doc. No. 25), and subsequently filed a Motion for Summary Judgment on the issue of Plaintiff's status as a third-party beneficiary (Rec. Doc. No. 34), which the Court denied on July 9, 2012. (Rec. Doc. No. 51).

Defendant filed the instant motions seeking dismissal of Plaintiff's action because the operators of the property were the borrowed employees of Apache and the Offshore Operating Agreement "bars any claim by [Plaintiff] against Apache and its employees (borrowed or otherwise)." (Rec. Doc. No. 56-2, p.1). Defendant also seeks to dismiss claims of lost royalty payments in Plaintiff's

capacity as an overriding royalty interest owner. (Rec. Doc. No. 52).

**SUMMARY JUDGMENT STANDARD OF REVIEW**

A motion for summary judgment shall be granted by a court "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to the judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party must support a motion by either citing to materials available in the record or showing that the materials do not establish the absence or presence of a genuine dispute. *Id.* at 56(c). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits" affirmatively show that there is no material issue of fact. *Id.; Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The burden is on the moving party to identify portions of the record that demonstrate the absence of a genuine issue of material fact. *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398 (5th Cir. 2008); *Washburn v. Harvey*, 504 F.3d 505, 508 (5th Cir. 2007). However, the burden shifts to the non-moving party if the movant can demonstrate that there is no material fact in dispute. *Celotex*, 477 U.S. at 325.

The court is required to draw inferences of fact in a light most favorable to the non-moving party. *See, e.g. Matsushita Elec. Indust. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986);

*Delta Pine & Land Co.*, 530 F.3d at 398. A party opposing a properly supported motion for summary judgment must set forth specific facts showing that there are genuine issues of material fact to be presented at trial. *See* Fed. R. Civ. P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

<b><u>DEFENDANT'S MOTION AS TO BORROWED SERVANTS</u></b>

**A.     Contentions of the Parties**

Defendant makes two claims in its summary judgment motion regarding the issue of borrowed servants: 1) that the operators it provided to Apache are borrowed employees of Apache and 2) that, because of the borrowed employee status, Plaintiff's claims are barred. (Rec. Doc. No. 56-2, p.6).

In rebuttal, Plaintiff argues that the contract between Apache and Defendant identified Defendant's employees as independent contractors and not borrowed servants. (Rec. Doc. No. 75, p.2). Plaintiff further argues that even if the operators were borrowed employees/servants, Defendant remains liable for their actions under *Morgan v. ABC Manuf.*, 710 So.2d 1077 (La. 1998). (Rec. Doc. No. 75, p.12).

Defendant's reply supplements its original arguments and addresses some of the arguments raised in Plaintiff's opposition on the nine-factor test for borrowed servants. (Rec. Doc. No. 88). Defendant does not address Plaintiff's argument under *Morgan v. ABC Manuf.* regarding Louisiana's dual-employer doctrine.

**B.   The Question of Borrowed Servant Status**

To determine whether an individual is a company's borrowed employee, courts consider nine factors:[1]

> 1. Who has control over the employee and the work he is performing, beyond mere suggestion of details or cooperation?
>
> 2. Whose work is being performed?
>
> 3. Was there an agreement, understanding, or meeting of the minds between the original and borrowing employer?
>
> 4. Did the employee acquiesce in the new work situation?
>
> 5. Did the original employer terminate his relationship with the employee?
>
> 6. Who furnished tools and place for performance?
>
> 7. Was the new employment over a considerable length of time?
>
> 8. Who had the right to discharge the employee?
>
> 9. Who had the obligation to pay the employee?

*Melancon v. Amoco Prod. Co.*, 834 F.2d 1238, 1244 (5th Cir. 1988).

While "no one of these factors, or any combination of them, is decisive, and no fixed test is used to determine the existence of a borrowed-servant relationship," *Ruiz v. Shell Oil Co.*, 413 F.2d 310, 312–13 (5th Cir. 1969), the central question is "whether someone has the *power to control* and direct another person in the performance of his work." *Hebron v. Union Oil Co. of Calif.*, 634

---

[1] Both parties agree that this is the proper test to apply here. (Rec. Doc. No. 56-2, p.9; Rec. Doc. No. 75, p.6).

F.2d 245, 247 (5th Cir. 1981) (emphasis added). Whether a person is a borrowed employee is a question of law, but one that often is driven by important factual disputes. *Billizon v. Conoco, Inc.*, 993 F.2d 104, 105 (5th Cir. 1993).

1.  <u>Who has control over the employee and the work he is performing, beyond mere suggestion of details or cooperation</u>?

The first factor has been considered the central issue of borrowed employee status, although not necessarily determinative. *Melancon*, 834 F.2d at 1244-45. In *Melancon*, the Fifth Circuit found that the borrowing employer had control over the employee's work where the employee "took orders only from [the borrowing employer's] personnel who told him what work to do, and when and where to do it" and the lending employer "gave no instructions to [the employee] except to go to the. . .field and perform the work requested by [the borrowing employer's] personnel." *Id*. at 1245. Where there is conflicting evidence regarding the control factor, however, the court cannot grant summary judgment. *Brown v. Union Oil Co. of Calif.*, 984 F.2d 674, 677 (5th Cir. 1993) (holding there was material fact as to who had control over the worker). In reversing a directed verdict on the issue of borrowed servant status, the Fifth Circuit held:

> At trial, the parties presented conflicting testimony regarding who instructed Brown [the employee] on how, where, and when to clean the mud [on the platform at issue]. Brown testified that during his first hitch with Union [the borrowing employer], he was supervised by a

> Gulf Inland [the lending employer] employee, Jimmy Funge . . . .
>
> . . .
>
> Brown testified that he would follow Union's instructions unless the instructions were contrary to Gulf Inland's policies or safety practices. Gulf Inland's superintendent testified that if Brown was asked to do something against Gulf Inland's policies, Brown was instructed to call Gulf Inland to deal with the conflict.
>
> With regard to the control factor, Brown presented evidence that he was not working under Union's supervision or its cleaning instructions. *This first factor, which does not overwhelmingly support Brown's borrowed employee status, involves disputed factual issues. It should not have been taken from the jury.*

*Id.* (emphasis added).

Here, the parties both present significant evidence on the issue of control. (Rec. Doc. No. 56-2, pp.8-10; Rec. Doc. No. 75, pp.6-8). As in *Brown*, this first factor involves disputed factual issues, which cannot be resolved at this juncture. Defendant trained its employees to work on Apache's platform with little supervision by Apache employees (Rec. Doc. No. 75, p.6), but the operators were required to follow Apache safety protocol. (Rec. Doc. No. 56-2, p.9). It is not clear whether and to what extent Defendant and Apache shared control over the operators or whether and to what extent Defendant maintained control over its employees as they worked on Apache's platform. As such, there are disputed material factual issues concerning the issue of control.

2. <u>Whose work is being performed</u>?

The parties dispute this factor. Defendant claims that the operators performed work for Apache's benefit. (Rec. Doc. No. 56-2,

7

p.10). However, Defendant maintains that it was in the business of operating platforms and that it was operating the platform for Apache through IOC's employees.[2] (Rec. Doc. No. 75, p.8). As such, there is a question of material fact as to whose work was being performed, which cannot be resolved at this stage.

> 3. <u>Was there an agreement, understanding, or meeting of the minds between the original and borrowing employer</u>?

It is undisputed that the parties entered into an agreement wherein Defendant agreed to provide personnel to Apache to operate its oil and gas operations. (Rec. Doc. No. 56-2, p.10; Rec. Doc. No. 75, p.9). The contract purports to prohibit the operators' borrowed employee status. Such contract provision, however, does not automatically prevent borrowed employee status from arising. *Melancon*, 834 F.2d at 1245.[3] The parties' actions in carrying out the contract can impliedly modify or waive the express provision.

---

[2]
> It is undisputed that all work performed by the Operators on the platform was the work of Apache. While the Operators were assigned to the EC-2 platform, they were undisputedly performing Apache's work. This work, while on the payroll of IOC, was performed at the Apache site, for the benefit of Apache's offshore oil and gas business. Their work was essential to maintaining the production of oil and gas from Apache's EC-2 platform.

(Rec. Doc. No. 56-1 at 6).

[3]
> Provision 6 of the "Well and Lease Service Master Contract" does specify that no Beraud employee is to be considered the agent, servant, or representative of Amoco. The reality at the worksite and the parties' actions in carrying out a contract, however, can impliedly modify, alter, or waive express contract provisions.

*Melacon v. Amoco Production Co.*, 834 F.2d 1238, 1245 (5th Cir. 1988).

8

*Id.* Whether the parties had an understanding that modified the contract may raise disputed factual issues. *Id.* at 1245 n.13.

In *West v. Kerr-McGee Corp.*, 765 F.2d 526 (5th Cir. 1985), the Fifth Circuit reversed a district court's summary judgment ruling that found the plaintiff to be a borrowed employee. The Fifth Circuit, primarily concerned with the contract provision that purported to prohibit borrowed employee status, concluded that "enough conflicting evidence [had] surfaced to make summary judgment for the defense inappropriate." *Id.* at 531.

As in *West*, the contract provision in this case purporting to prohibit borrowed employee status presents enough conflicting evidence to preclude summary judgment at this juncture.

4. <u>Did the employee acquiesce in the new work situation</u>?

The parties do not dispute that Defendant's employees acquiesced in working on Apache's platform. (Rec. Doc. No. 56-2, p.12; Rec. Doc. No. 75, p.10).

5. <u>Did the original employer terminate his relationship with the employee</u>?

Defendant maintains that the relationship between it and the operators terminated. "The emphasis when considering this factor should focus on the lending employer's relationship with the employee while the borrowing occurs." *Capps v. N.L. Baroid-NL Indus., Inc.*, 784 F.2d 615, 618 (5th Cir. 1986). Where the lending employer exercised no control over the employee and placed no

9

restrictions with respect to employment conditions, the relationship is terminated. *Id.* (" We do not believe that this factor requires a lending employer to completely sever his relationship with the employee.).

Defendant notes that holding safety meetings does not preclude a finding of borrowed employee status (Rec. Doc. No. 88, p.9), but Plaintiff has presented evidence that Defendant also arranged for safety reports and action cards, paid for supervised training, wages and benefits, maintained telephone communications, and conducted a compliance program. (Rec. Doc. No. 75, p.11). In *Brown v. Union Oil Co. of Calif.*, 984 F.2d at 678-79, the Fifth Circuit found that the lending employer had not relinquished all control over the employee where there was evidence that the lending employer supervised the work of the employee and had the right to take the employee off the platform, if the lending employer needed him elsewhere.

As noted above, it is not clear whether and to what extent Defendant and Apache shared control over the operators or whether and to what extent Defendant maintained control over its employees as they worked on Apache's platform. Thus, this factor cannot be resolved at this summary judgment stage.

6. <u>Who furnished tools and place for performance</u>?

It is undisputed that Apache provided the tools and place of performance. (Rec. Doc. No. 56-2, pp.13-14; Rec. Doc. No. 75, p.11).

7. <u>Was the new employment over a considerable length of time</u>?

The parties do not dispute that the operators have worked on Apache's platform for more than two years. (Rec. Doc. No. 56-2, p.14; Rec. Doc. No. 75, p.11).

8. <u>Who had the right to discharge the employee</u>?

The proper focus for this factor is to determine whether the borrowing employer (Apache) had the right to terminate the employees' services with itself, not whether Apache could terminate the employees from working for Defendant. *Capps*, 784 F.2d at 618. The evidence shows, unequivocally, that Apache had the power to remove an IOC employee from working on its platform. (Rec. Doc. No. 75, p.11; Rec. Doc. No. 88, p.9).

9. <u>Who had the obligation to pay the employee</u>?

The ninth, and last, factor places emphasis on whether the borrowing employer had the obligation to pay the employee. In *Capps*, the Fifth Circuit held that where the lending employer had the obligation to pay the employee, but received the funds to pay the employee from the borrowing employer, the borrowing employer "in essence" paid the employee. *Capps*, 784 F.2d at 618.

Applying the nine factors to the present action, the Court finds that there are genuine issues of material fact as to whether

11

Defendant's operators were the borrowed employees of Apache, particularly with respect to control, the work performed, and the termination of the lending employer/employee relationship. Because the Court has not found the existence of borrowed employee status, the Court need not address Louisiana's dual employer doctrine at this juncture.[4] Given the existence of genuine issues of material fact, summary judgment on the issue of borrowed employee status is not appropriate at this time.

## DEFENDANT'S MOTION AS TO ROYALTY PAYMENTS

**A.  Contentions of the Parties**

In its Motion for Partial Summary Judgment, Defendant argues that Plaintiff's claim of lost royalty payments is, in effect, a claim of delayed or deferred production. (Rec. Doc. No. 52-2, p.3). Defendant contends that because no oil and gas were lost during the period of time that the platform was shut-in, Plaintiff has not

---

[4] In *LeJeune v. Allstate Ins. Co.*, 365 So.2d 471 (La. 1978), the Louisiana Supreme Court revisited the issue of the borrowed employee defense, and repudiated the one master rule in favor of finding both the general employer and the special employer solidarily liable for the torts of the borrowed employee. the court held:

> [The borrowed employee] determination should not relieve the general employer of his liability for his employee's negligent acts done in the pursuance of duties designated for him by his employer, in whose pay he continued and who had the sole right to discharge him. *This is especially so in the present case, where the employee was loaned out to another in a continuing arrangement between the employers for their mutual benefit.*

*LeJeune* at 481 (emphasis added).

The "dual employer" rule was reaffirmed by the Louisiana supreme Court in *Blair v. Tynes*, 621 So.2d 591 (La. 1993) and again in *Morgan v. ABC Manuf.*, 710 So.2d 1077 (La. 1998).

experienced any loss. (*Id.*). Thus, Defendant maintains that Plaintiff cannot support its loss of production claim and that said claim must be dismissed.

Plaintiff argues in its Opposition that its loss of production claim is governed by the Fifth Circuit's opinion in *Continental Oil Co. v. SS Electra*, 431 F.2d 391 (5th Cir. 1970), which permits an award of damages for a delay in oil production.[5] (Rec. Doc. No. 58, p.3). Plaintiff also argues that royalty interests are property rights protected by the Louisiana Mineral Code and that courts have awarded damages for losses attributable to diminished overriding royalties. (*Id.* at p.4). Plaintiff asserts that production was suspended for one year, during which time Plaintiff suffered loss of income attributable to its overriding royalty interests and working interests. (*Id.* at p.1).

In reply to Plaintiff's Opposition, Defendant notes that overriding royalties are passive interests, triggered only by actual production. (Rec. Doc. No. 68, p.3). Thus, Defendant contends, in order for Plaintiff to be entitled to any overriding royalties, there must first be production. (*Id.*). Further, Defendant argues that Plaintiff, as an overriding royalty owner, does not have the right to assert a claim against a tortfeasor for deferred or delayed production, because such a claim rests with the

---

[5] "The fact that the same amount of profit can be made at a later time with the same investment of capital by removing from the ground a like quantity of oil at the same site does not alter the fact that the plaintiffs are out of pocket a return on . . . [the] use of their investment." *Id.* at 392.

holders of working interests. (*Id.* at p.6, citing *In the Matter of TT Boat Corp.*, 1999 WL 1276837 (E.D. La. 1999)).

**B.   Availability of Lost Profits**

Plaintiff relies upon the Fifth Circuit case of *Continental Oil Co. v. S.S. Electra*, 431 F.2d 391 (5th Cir. 1970). That case involved an offshore drilling platform. A vessel collided with the platform causing damage to the platform. Although there was no damage to the oil wells and no loss of oil, the platform was damaged such that production was halted for a period of 130 days. The district court found that, because the oil remained available for extraction and sale, the proper measure of damages was the interest on the net oil production during that 130-day period. The Court of Appeals reversed, stating that:

> The oil companies do not claim for lost oil or damage to oil as an asset. Their suit is for damages suffered as a consequence of the collision of the ship with the platform. *Profit on oil production is simply one means of measuring the damage suffered*. The plaintiffs have lost the use of their capital investment in lease, platform and producing wells for 130 days during which that investment was tied up without return. The fact that the same amount of profit can be made at a later time with the same investment of capital by removing from the ground a like quantity of oil at the same site does not alter the fact that the plaintiffs are out of pocket a return on 130 days use of their investment.

*Electra* at 392 (emphasis ours).

The court specifically noted, however, that "[w]e need not consider whether lost profit or a fair return on investment is a

14

better measure. . . . The only evidence before us is of lost profit." *Id.* at 393 n.3.

The holding in *Electra* was further explained in *Nerco Oil & Gas, Inc. v. Otto Candies, Inc.*, 74 F.3d 667, 668 (5th Cir. 1996). That case also involved a collision between a vessel and an offshore oil and gas platform causing the platform to be shut-in for between 31 and 50 days. The question before the Court of Appeals was whether lost profits was the proper measure of damages when an offshore well is shut-in as the result of an allision. The court noted that "*[t]he true damages to the platform owners. . . is that they will be required to remain at the site longer than expected to recover the oil. . . .*" *Nerco*, 74 F.3d at 669 (emphasis ours). Based on the facts presented, the court found that damages were better determined by calculating loss directly attributed to the interruption of production rather than lost profits. *Id.* at 669-70.

While lost profits may be an appropriate form of damages in the proper case, courts have noted that "awarding a plaintiff net profits as compensation for deferred production is tantamount to a windfall to the plaintiff" and, therefore, other methodologies are preferable. *In re TT Boat Corp.*, 1999 U.S. Dist. LEXIS 19541, 1999 WL 1276837, at *3 (E.D. La. 1999); *see also Agip Petroleum Co. v. Gulf Island Fabrication, Inc.*, 17 F.Supp.2d 660, 662 (S.D. Tex.

1998); *Mobil Exploration & Producing v. AZ/Grant Intern. Co.*, 1996 WL 194931, at *6 (E.D. La. 1996).

As such, summary judgment on the issue of the availability of lost profits is inappropriate at this time. Without being presented with sufficient facts, the Court cannot determine at this time whether damages are better calculated from losses directly attributed to the interruption of production or from lost profits. *See, e.g., Nerco*, 74 F.3d at 669-70 ("Contrary to the platform owner's position, our holding in *Electra* did not determine that 'lost profits' was the required measure. We only determined that *it was one measure of damages* and that it was a better measure than interest on lost profits.")(emphasis added).

New Orleans, Louisiana, this 20th day of August, 2012.

_____
UNITED STATES DISTRICT JUDGE